May it please the Court, Amy Vansom for the Rural Coalition Petitioners, including farmworker and conservation organizations. I plan to reserve three minutes of my time for rebuttal. EPA's 2020 decision violated federal law in two major ways. First, it violated FFRA because EPA's conclusion that glyphosate poses no health risks at all was not supported by substantial evidence. Second, it violated the Endangered Species Act because EPA failed to make any effects determination despite taking a discretionary action that could have protected listed species. Finally, because of these serious errors, the Court should vacate the decision. Turning to my first major issue, EPA's conclusion that there were quote no risks to human health at ER-12 lacked substantial evidence because of three major gaps in data. First, as to non-Hodgkin's lymphoma, this is the most glaring cancer concern out there that's showing up in real people after exposure to glyphosate. But EPA could come to no conclusion as to non-Hodgkin's lymphoma and yet still concluded that there's no cancer risk at all. In its revised issue paper, EPA admitted that it had no conclusion as to glyphosate and non-Hodgkin's lymphoma, that's at SER-171, and yet still decided that glyphosate overall is, quote, not likely to cause cancer. But EPA has... Counsel, is there a difference between not likely and what you call no risk at all? As I understood their determination here, they said we've got so many studies, we really can't say inadequate. So we're left, if the descriptor is important, we're left to a choice between not likely and suggested. That's a little different from no risk at all, isn't it? That's right, Judge Bob. The designation that EPA chose for cancer in general was not likely to cause cancer. But when it came to conclusion as to human health risk in its human health risk assessment was that there were no human health risks of concern and, as I quoted earlier, no risks to human health. So overall, it made that decision that there were no risks to human health, and a part of that was that it found that glyphosate was not likely to cause cancer. But the problem here is that it could not make that same finding as to non-Hodgkin's lymphoma, which is the major cancer concern. It's the one thing that it really needed to have a conclusion on if it was going to say that glyphosate is not likely to cause cancer. So say we agreed with you that the wrong cancer designator was chosen, the wrong category here, but we disagree with you that concluding that would mean the pesticide registration gets canceled. Is there any other effect of which designator is given? Can you explain what it would mean if we agreed with you that a different designator should be chosen? As a practical matter, what effect would that have? Practically, Judge Friedlander, that would have led EPA, if it made a different risk assessment at that finding that there are human health risks, it would then have to do a cost-benefit analysis to see are those unreasonable risks, and practically then it would either go ahead and cancel products or it might increase the mitigation measures in the form of label amendments. So that might be something like requiring the label to be more protective of human health and those kinds of things. So there's practical changes to the products themselves after it finishes its lawful risk assessment. Is there a holding or is there a regulatory statement that choosing a particular descriptor has necessary consequences? I ask that because when I read their analysis of all of these different descriptors, it's full of kind of fuzz about, well, this is a narrative description and you can't just rely on the descriptors. You have to look at it all to see holistically what it means. And I didn't see anything in your briefing that points to something that says this descriptor leads to this consequence. Is there something I should find that? Well, I think, first of all, there aren't any cases on these registration review processes yet because the statutory deadline is later this year. But the pollinator stewardship council case before this court also looked at pesticide registration under the same substantial evidence standard. And it held that ambiguous studies were not enough to come to a no unreasonable risk conclusion. And remember, unreasonable risk is the question of whether it's safe or not for pesticides. So here this court said that EPA was trying to say that even though these bees studies were inconclusive, there was still no unreasonable risk to bees. And the court said neither logic nor precedent could sustain that position. But the agency cannot rely on ambiguous studies or... And what was the context of that? Was that in registration review also? No, that was a registration of the pesticide, pesticide sophosphorus. Initial registration. Yes. Okay. So part of the answer as well to your question is how did EPA get to this no conclusion as to non-Hodgkin's lymphoma and what does that mean? Well, EPA ignored its own experts and guidelines when it made this no conclusion. It discounted numerous epidemiological studies and comprehensive analyses of the same. And it ignored animal studies showing tumors. So its scientific advisory panel, which are the congressionally created expert body, told EPA that these meta-analyses or a comprehensive study of multiple studies was, quote, the best tool to assess whether glyphosate causes non-Hodgkin's lymphoma. EPA ignored that advice in favor of a single study. But many of these comprehensive studies included the data from that one agricultural health study and still found, as the FAP said, statistically significant increases of 30 to 50% in risk of contracting non-Hodgkin's lymphoma after glyphosate exposure. That's at ER 619. So EPA is ignoring its own experts, including its experts in the Office of Research and Development, which are our research scientists that are separate from the pesticide regulators. They also found that glyphosate should be designated as either likely to cause cancer or at least suggestive evidence of increased risk. And that's at ER 939 to 944. If you find, if you find that they've left something out, why wouldn't we want to send it back to EPA to do the, what you asked them to do, so that we can find out what the decision-maker or recommended decision-maker has to say following your attack? Well, Judge Wallace, we would want EPA to redo its assessment, but this isn't one of the claims that EPA has asked for voluntary remand on. It has no plans to change this unless the court rules in petitioner's favor saying this risk assessment was not supported, the human health risk assessment was not supported by substantial evidence. And yes, they would need to go back and redo that. Petitioner has also asked that the court vacate that decision to ensure that EPA does this, you know, redoes its process in a reasonable amount of time rather than leaving this open-ended, indefinite remand. Well, EPA knows better what they need to do than three judges with robes on. Why wouldn't we leave that up to EPA? Well, Judge Wallace, we would leave it up, the court would leave it up to EPA once the decision is vacated that sends us back to the status quo ante, and then EPA is free to take any lawful action it wants on remand, including in line with the court's order, potentially that the human health risk assessment will not evolve. But as I understand it, your position is that, quote, vacating automatically deregisters all the glyphosate activities as opposed to, I suppose, the contrary view is that whether we vacate or don't vacate, they still haven't come up to the FIFRA deadline, which one statutory interpretation would be nothing really happens until then. Am I right? Your position is, oh, well, just vacate it, and you say the consequence is that all of this is deregistered. Am I right? Yes, Judge Bob. That is the Rural Coalition petitioner's position that because this is the major question of FIFRA, whether or not if EPA's decision that they did meet that standard is vacated, that pulls the rug out of all of these doubts. But that does mean that, in effect, on that view, agencies should never issue interim decisions because if they hadn't issued an interim decision, you wouldn't have anything to stand on, would you? Which is a very odd position to take, isn't it? FIFRA does not require that EPA does any of these interim decisions. EPA decided on its own to make this interim decision, but this decision really did finalize these risk assessments. These are the two risk assessments that EPA needs to do. It did its cost-benefit analysis. There's really nothing left for EPA to do under FIFRA, and it only has two things that it's going to go do further, which is an endocrine screening under the Food, Drug, and Cosmetic Act and answering a petition. Other than new decision-makers might well make a different decision. That has happened in Washington in the past, has it not, when an administration changes their view of the same record changes? Yes, and we hope EPA does make a new decision here because it left out these major areas in data when it comes to human health. And what are the duties that EPA has when it makes an affirmative decision like this? And as it's going to be making many more of these registration review decisions, petitioners posit that it needs to comply with FIFRA and it needs to comply with the Endangered Species Act when it makes these interim decisions. And so the court should send it back to EPA, should vacate this decision, and I see that I'm cutting into my rebuttal time. We'll give you some extra time. I actually have another question. So as long as the panel has questions, please feel like you can keep answering. So as to the ESA claim, can you explain whether there's anything we can do, if we agree with you, that consultation should have happened a long time ago. Is there anything we can do to fix that fact at this point? How is your ESA claim redressable? It's redressable, Judge Friedland, because if EPA has to go back and has its interim decision vacated, then it can now use this effect determination it's made, but it can issue a new interim decision that has more protective, for example, mitigation measures in the form of label amendments. So if it has to go back and actually look at the impact from this consultation, which as we know is almost 1,800 species and 800 critical habitats, it can actually amend how the products are used right now as, you know, pending any final decision. So that's... So how could it do that? I mean, your argument is it couldn't issue the interim decision without first complying with the ESA. But are you saying now that you think they can issue another interim decision without first complying with the ESA? I don't really understand how that's possible under your theory. I mean, ideally, yes, they would have finished the consultation that is complying with the interim decision. So a ruling that they have to comply with the ESA before doing these decisions is helpful not only for this pesticide, but also for other, you know, registration reviews going forward. But here, I think it would be reasonable that given, you know, the timing, how long consultation will take, that EPA could act to reset its interim mitigation measures to ensure protection for ESA species, because it knows more now than it did before, including that there's going to be adverse effects to thousands of species. So, you know, it's both the ruling in and of itself to guide EPA on what its legal duties are when it makes these interim decisions, and it's also EPA going back and actually redoing its mitigation measures. That would be... So as I understand it, the FIFRA deadline is less than a year away. So if we say that before they get to a final decision, they have to comply with the ESA, will that have any meaning at all? I'm still struggling with whether your claim is actually redressable, because it seems like you're kind of saying, forget about the ESA, let them do another interim decision. We're going to get to a final decision soon, and I'm still not sure how we're going to force them to comply with the ESA. Right. Well, the statutory deadline under FIFRA is October of this year, and there is very...it's very unlikely that the consultation process will be done by that time, as we've seen in consultations, biological opinions have taken much longer for less species. That is also a question for EPA. We do think that it will be a problem of them meeting their statutory deadline, although that is a different agency action than the one that's before the court, which is the interim decision. So again, if EPA has to go back and redo both its FIFRA risk assessments and take into account its consultation, you know, it would be resetting new interim mitigation measures, hopefully, again. That would affect the product. Now, whether it can do that before October of this year is highly questionable, and that's in EPA's court. You've stressed very much that you want us to vacate what's happened, whether we agree with that or not. Why? Why not let the EPA have it without vacating it? Just send it back and let them tell us what their findings are. Well, the concern we have, Judge Wallace, is that our environmental claims under FIFRA will never actually get judicial review, because EPA has indicated it might wait until its final decision to do anything different as to this interim decision that's before the court. It might wait. It might not wait. We don't know. Why don't we leave it to EPA, the experts? Why should we muck with it a little bit up here in the appellate court? Why not just send it back? Well, Judge Wallace, because... I understand you want to get your decision made differently, but from our point of view, why not just send it back to this... We don't believe they're criminals. We believe that they're people that are government workers that are trying to do the best. Why would we tell them, vacate it all? Why not just send it back to... Have them take a look at it? Well, Judge Wallace, VOCADR is the presumptive remedy both under the FIFRA provision for judicial review and under the APA and under the Endangered Species Act. So the presumption is that when an agency makes a decision that's unlawful as EPA did here, it should be vacated. And this is not one of those rare cases where VOCADR will risk more harm than not. And that is the inquiry that the court should make. Here we have serious errors of law, and the disruptive consequences are not going to be to the environment so much as economic. And this court has vacated pesticide registrations, even where there were economic harms, as in the National Family Farmer Coalition case on Vicampa. But we could, if we wanted to, just send it back without a vacate. Correct? Correct, Judge Wallace. We could, after doing that VOCADR test to determine whether this is one of those rare times where remand without VOCADR is appropriate. You said, I think your answer is yes. Who could? Yes, Judge Wallace, you could. Petitioners would stress that the test for whether or not to vacate, whether or not to not take that default remedy of VOCADR weighs heavily in favor of vacating, as we argued in our briefs. So my understanding is the interim decision does at least take steps toward imposing some labeling requirements that maybe haven't actually been implemented yet, but at least have been sort of announced. It seems like, is the only real difference whether we vacate right now or not, as to the NRDC part of the case, whether those might get implemented in the meantime or not? It sounds like potentially a question for my colleague, Mr. Rhodes, but you're right that the EPA took three mitigation measures. They were in the form of label amendments. They have not been applied yet, but they do apply to the product. So it is rural coalition petitioners' position still that vacating this decision would apply to all the actual products in use. Sorry, I understand that you think the petition should be deregistered, but let's put that aside. So let's say that's probably not going to be the effect. Even if we vacate the interim decision, we don't agree with you that that's what will happen. I'm trying to figure out if rural coalition has a problem with the labeling that EPA seems to want to implement. Like, EPA is saying, we want to remand on the NRDC part of the case, but we want to keep the interim decision in the meantime so we can implement these things that they say are protective measures. Now, you're fighting the remand at all, but I'm trying to figure out what you think about those protective measures. Like, are you not happy with them? Happy with them? Think they're useless? What do you think about those protective measures and whether that should affect our thoughts about vacating? Thank you for clarifying the question, Judge Friedland. We think those mitigation measures are useless. They do very little. All they do is say, follow the label that's already in existence. So, we have, you know, makes very little difference whether or not those themselves are vacated because EPA, you know, and again, our redress is the EPA going back, redoing these risk assessments, doing its consultation, and then setting mitigation measures that are actually going to be protective of species and human health. Does that answer your question? I think it does. I have one question back on the science, which is that it seems like EPA thought that the exposure to glyphosate was not going to be at the levels that caused the tumors in the studies. So, this 1,000 milligrams per kilogram per day amount, they seem to think the tumors are happening above that. People are getting exposed much below that. Can you explain why you think they're I think you're speaking about the animal studies. Now, EPA discounted studies that had doses that were in excess of that 1,000 milligrams, but as the SAP pointed out, its own guidelines allow for considerably larger doses in rats than mice. That's its own cancer guidelines. So, these are studies that are designed to determine if a pesticide is carcinogenic, and when EPA is disregarding those studies, it's not looking at studies that show that. And there were several other ways that it disregarded those studies, but basically had it listened to the SAP, it would have found that at least six of 15 rodent studies showed evidence of cancer. So, that would have been a major change. And then, more broadly, one of the major gaps in data was EPA didn't look at how much glyphosate enters your bloodstream when glyphosate gets on your skin. And so, no one disputes that that is a major route of exposure, but EPA didn't collect even one study to determine that. And that's against its own guidelines and regulations, and as Monsanto itself has said, these different surfactants in the products can actually increase how much glyphosate gets into your bloodstream. So, we really, that's one of the big data gaps here. It's not about how much is being exposed. We don't know how much is actually getting into workers' bloodstreams. EPA essentially said that people could bathe in glyphosate and it would be safe without having the data to back that up. Do we have reason to think that any skin exposure could get up to the 1000 milligrams per kilogram per day? That's an amount that was for, you know, for animal studies. So, when EPA goes and sets its tolerances for exposure, it uses a 100-fold safety standard. So, it's hard for me to say right now whether that exposure would reach that level. But again, EPA has no way of knowing without actual study how much will get into the bloodstream. So, it may say that this amount is safe, but we really just don't know that without actually having that data in hand. And I just wanted to finally mention that the product was one of the other big data gaps, and I mentioned that. As Monsanto's chief toxicologist warned, you cannot say that Roundup is not a carcinogen because they have not done the testing on the actual formulations that people use in the real world. It's an ER 1760, and if the panel has no further questions, I should probably stop talking. Thank you, counsel. So, I think we have Mr. Rhodes next. Is that right? Yes, thank you, Judge Friedland. Lucas Rhodes, counsel for Natural Resources Defense Counsel and Pesticide Action Network North America. I plan to reserve two minutes for rebuttal. I'll be sure to keep an eye on my time. May it please the court. In light of EPA's pending motion for remand, I plan to address just two issues today that have been fully briefed before the court. The first is EPA's failure to respond to NRDC's comment on the proposed decision here, which raises significant information that is missing from EPA's assessment of the human health effects of glyphosate. Second, if the court were to grant EPA's motion for voluntary remand, the court should set a deadline for remand of 90 days, and the court should retain jurisdiction over the entirety of this petition. First, if we remand, did you just pull 90 days out? What have courts done in the past when they remand without a painter? I can see your point. I mean, we want them to get on with it and get back, because this is a serious case. On the other hand, I don't know the difference between 90 days or 80 days or 50 days. Can you tell me what the designation is, how you come up with the 90-day limit? Yes, Your Honor. So, there isn't a particular court case that we're pointing to that has set a deadline for 90 days in an analogous circumstance. Petitioners came up with 90 days essentially by balancing the prejudice to petitioners from delayed resolution of their claims and balancing that against the practical reality that EPA obviously needs some time to complete its remand. And so, that's where petitioners arrived at this 90-day figure. But in the end, Your Honor, I think the important point, as you note, is not whether it's 90 days or 80 days or 100. The important point is that EPA resolves these issues within a reasonable time frame, and their motion just doesn't suggest that they're going to do that. So, when you say resolve it within a reasonable time, is it your contemplation that resolving it, in effect, requires a new or amplified interim decision rather than simply a final decision? That is, I ask that because my sort of simple-minded view of this might be that they're supposed to make a final decision by October 1, and why shouldn't it just all run to October 1, and if they don't do it, then come to a court and hammer them? Well, Your Honor, as you know, I mean, in EPA's motion for remand, they indicate that they intend to address these issues in their final registration review decision. And all signs at this time point to the fact that EPA is not going to make that October 1 deadline. In fact, that final determination is dependent on the completion of several independent analyses that typically take years, and I'm referring specifically to the ESA Section 7 consultation. And so, for that reason, EPA should not be waiting until its final registration review decision to address these issues that are properly before the court now. In your view, what is it that happens on October 2? Let's assume that you're correct. We'll hear from them as to what they think. But on October 2, they haven't issued a final decision, whether they've issued another interim one or not. In your view, what happens on October 2? Does it all vanish into thin air the way your colleague perhaps thinks? So, are you asking, Your Honor, if on October 2, 2022, the underlying registrations are vacated, or are you talking about whether... So, I think that question is not squarely before the court at this time, Your Honor. And NRDC and PANDA do not ask for a vacater of the interim decision based on the remaining claims here. So, that's... There is a question about... The statute says that EPA needs to issue a final registration review decision by that October 1, 2022 deadline. If they were to do something short of a final registration review decision, that's a question for the courts to consider at that time. Do you think that ESA compliance is not required before an interim decision? So, you disagree with Rural Coalition on that? NRDC petitioners have not taken a position on whether the... Whether ESA consultation is required prior to the interim decision. With that said, we do believe the interim decision is final agency action, and that ESA consultation is required prior to this kind of discretionary final agency action. So, the puzzle is that you'd like us to set, like, a 90-day deadline to do a new, I think, interim decision, but if we think an interim decision is enough of a final agency action to require ESA compliance, are you asking us to order the agency to violate the ESA? Well, Your Honor, the court should set a deadline for the agency to resolve the issues that they have requested remand on. No matter what the form of that is, EPA needs to address these remanded issues that are properly before the court now. They need to address those within a reasonable time. So, whether that's in the form of an interim decision or a final registration review decision, it is less important to NRDC petitioners. The important thing is that this is resolved within a reasonable time. But is there any chance it will be? I mean, we're, like, really in a box here, because it's very hard to figure out how we can, even if we agree with you, how we can help you at this point, because everything takes so long, it seems. It's true, Your Honor, that consultation typically takes a long time, but the court could issue an order here requiring EPA to resolve these particular issues within a reasonable time frame, whether that's 90 days or some other deadline. That is NRDC petitioner's position. When you say there's a reasonable deadline, I'm just saying, what, for myself? How would I make a determination whether that's 60, 70, 80, 90, 100 days? Is there some problem with... EPA is the one that's got the knowledge. They're the ones that have to make a decision. I don't think they're bad people. At least, that's not been my experience. So, isn't there a different way of saying, with all reasonable due speed, this should be received, but not longer than something? But I don't understand the not longer than. If we do, we tell them, as I know, it's your job, you've got to get it out quickly, but then we tell them what quickly means. Well, Your Honor, I think, as I mentioned, I think the court could arrive at a reasonable deadline thinking about what the agency needs to do on remand and balancing that with petitioner's right to judicial review of their claims. At the absolute latest, Your Honor, that should be October 1st, 2022, to ensure minimally this FFRA analysis is done at that point. Are there any other issues involved than the in relationship to what is a reasonable time? That is, I'm aware there's a lot of litigation out there, personal injury litigation out there. Is there something we need to know about that so that we can make sure that all these various things are taken care of when we set a reasonable time? I'm not sure about the external cases, Your Honor, but there's a number of really significant costs and risks that EPA has simply not taken into account in promulgating this decision. And so, you know, all the while, I say it continues to be on the market and despite having raised significant concerns with EPA's analysis, those will still go unresolved. And so it's really critical here that the petitioners by delayed resolution of their claims. If we impose the deadline that the statute already imposes, would we be adding anything to the mix? How would that help anything? Well, Your Honor, if the court could ask, could direct EPA to address the issues, the issues raised by petitioners here by that deadline. But the way EPA is talking about its final registration review decision, it is saying that it's going to issue that final decision at the same time as it addresses all of these issues that petitioners have raised. It hasn't explained why it's necessary to complete all of these other analyses while it resolves petitioner's FIFRA concerns. But that's why if the court were to require EPA to address those issues by October 1st, 2022, it could allow the agency to do that well in advance of its final registration review decision. If we agree with Rural Coalition that the health, human health assessment needs to be redone, do we need to reach your argument about the notice and comment human health issue? Yes, Your Honor. I believe so, because even if you were to remand the human health portion of the decision to the agency with instructions to address Rural Coalitioners' concern, they also need to consider and respond to NRDC's comments which don't involve cancer risk of glyphosate. They're asking us to vacate the human health portion of the interim decision as I understand it. If we did that, would it need to be redone in a way that notice and comment would happen again? I'm trying to understand why your issue would still be there. If the decision were vacated, EPA's regulations do require notice and comment to issue an interim decision or final registration review decision, so it is conceivable that we could raise those concerns there, but the failure to respond to comments claims are squarely before the court now, and really the court has the opportunity to address those issues and ensure that EPA does address these important comments in any future proceeding. Counsel, I may not have heard you right. Did you say that they have to have notice and comment before issuing a final decision? Or did I hear that wrong? Yes, Your Honor. Again, EPA has not gone through this process of issuing a final registration review decision, but yes, the regulations would suggest that EPA has to go through notice and comment to issue a proposed final decision and a final final decision. So in your view, they have to do all of that by October 1 as well, or they simply have to have the proposed decision by October 1? The statute would suggest that the final registration review decision must be completed by October 1, 2022. Including the notice and comment? Yes. In that view, the real deadline for them to have a final decision that is a proposed final decision has got to be 30, 60, 90, 120 days before October 1. Is that your position? That's correct, Your Honor. That's what the statute requires. I see that I'm well over time, so I'll reserve the remainder of my time for rebuttal. That was very helpful. We have to know as much as we can so we can make as good a decision as we can. I'm sure we'll hear it from you if you disagree. Thank you, Your Honor. I think Mr. Dupre or Dupre is next. Yes, may it please the Court, Your Honor. Philip Dupre with the Department of Justice on behalf of EPA. There's obviously been a lot brought up with petitioners, but I think it boils down to that ultimately, this Court's review is conducted under a deferential standard that requires the Court to uphold the agency's decision if it's supported by substantial evidence in the record. That's clearly met here. Moreover, the request for, I would argue, uncommon relief should this Court find errors in the agency's action generally would go against the presumption of agency regularity and good faith that guide decisions of this Court, especially in ordering relief. With that said, I think it's worth starting out talking about the agency's decision about human health risks. Here again, the standard is whether or not the agency's decision was supported by substantial evidence in the record, and it clearly was. I'd like to point the Court to the non-Hodgkin's lymphoma. Some panelists thought that quote, based on the weight of evidence from epidemiological studies and meta-analyses, the agency cannot exclude the possibility that observed positive associations between glyphosate exposure and risk of NHL suggest carcinogenic potential glyphosate, even though study limitations and concerns about potential biases remain. Other panel members, however, strongly disagreed with such a statement. Here we have... So the problem that I'm having is that EPA said that it couldn't reach a conclusion about NHL and then chose the descriptor, not likely, and that seems to not match the cancer guidelines. If you can't tell, then I think there's two things. One is, I think the cancer guidelines, if you look at them in the record, are sort of narrative descriptions and not, I would say, precise terminology. In other words, you know, there's nothing that says, you know, if X, then Y in those guidelines. But the more important point is I think when EPA discussed the uncertainty, they were discussing the uncertainty in these epidemiological studies and not the information that the agency relied on from other studies. For instance, animal studies, other direct effects studies. And so here... Why is it not and the question is, you know, again, here again, the science advisory panel and EPA looked at epidemiological studies and there was substantial evidence to support the agency's conclusion that there was not a link between glyphosate and non-Hodgkin's lymphoma. Now, what the petitioners, I think, ultimately argue is that some of the data of these epidemiological studies and epidemiological studies only, we're not talking about genotoxicity studies or other types of studies that the agency evaluated, that some of this uncertainty into how to read them somehow means that you must conclude that glyphosate causes non-Hodgkin's lymphoma or is suggestive evidence. However, they framed it. But ultimately, the agency looked at this, they relied on the science advisory panel and concluded that there was not a risk of NHL from glyphosate. Go ahead, your honor. I mean, I just don't understand. So, I mean, it would be one thing if the reason given was some members of the advisory council said this, so we, or advisory panel said this, so that's our reason we're following them. But instead, they said, we can't tell if this person, if it causes NHL, but we're just going to declare that it's not likely to be carcinogenic anyway, which isn't the way the criteria work in the cancer guidelines. So, it seems like there's an incoherence in the explanation. Well, certainly, I can understand the court's concern with some of that language. I think, ultimately, I think two things. One is, I focused the court on the agency's look overall at potential links between glyphosate and human health concerns. And here, again, I think what the agency did in looking at these epidemiological studies was an appropriate response and reached an appropriate cancer conclusion based on the weight of evidence as a whole. It seems like there are objections, though. It seems like if you shift from the epidemiology to the animal studies, then we get into the issues of the monotonic dose responses and historical control data and pairwise testing and all these things that are in the cancer guidelines and seem, at least, from reading it, like they weren't followed. So, I'm really struggling with how the explanation matches the cancer guidelines that EPA said it was following. Well, Your Honor, I'd say with the caveat that I'm not an expert on monotonic testing or monotonic testing, I think the agency met the standard of review here. And I think a couple things that I do want to go into is, for instance, dermal absorption studies. To be clear, EPA had dermal absorption studies that showed there were rabbit studies, I believe from the 80s, that petitioners attack as simply being old simply because they're old. And I would say just because a study is old doesn't mean it doesn't have valuable data that the agency can rely on. And so, for instance, there were dermal absorption studies that the agency used in coming up with its standards. And more so, the epidemiological studies and agricultural health worker studies obviously take into account actual dermal exposure in assessing potential risks. So, on down the line, and again, we can get into the particulars, but the standards that are set for the agency to evaluate the human health risks of glyphosate were met here. Can you explain what your view is of the relevance of the chosen descriptor? Like, if we think a different one should have been chosen, does that have any practical effect? Well, I mean, in short, yes. Ultimately, looking at CFRA, the ultimate standard is unreasonable effects to the environment. And that includes human health effects. So, the agency would have to look at the effects and then make a determination of how to move forward. So, certainly, if they reached a different conclusion, they would move on to more of a balancing type analysis. Of course, they did not need to hear as the conclusion they reached was essentially no adverse human health effects. So, say the descriptor was suggestive evidence. Is there anything that would automatically follow from it being suggestive evidence? Or what would happen if it was suggestive evidence instead? I mean, the short answer is, if the court's question is, you know, would the registrations be pulled, the short answer is no. The agency would then take that cancer descriptor, plug it into its broader human health analysis conducted under CFRA, and address it under the standard set forth there. That standard is unreasonable risk? Yes. It's set forth in the statute in 136A, and then it's further defined in the regulations. I'll do my best to pull it up. I believe it's something along the lines of unreasonable. I know the phrase there, it sort of raises the question of, does a little bit of suggestive evidence or a whole lot of suggestive evidence cross some lines? Or is it simply that if you say it does have an effect, that they need to use different sets of words and say, okay, there is some suggestive evidence, but it's not unreasonable given everything else that we know. So, one of the things that I think is worth noting is that the way even today, there are warnings on when applying glyphosate, for instance, to where lawn sleeves to prevent potential thermal exposure. There are certainly guidelines and requirements the agency requires in registering a pesticide to potentially limit any adverse human health effect. And so, I guess I would say the agency on remand, if it were to reevaluate the human health effect, the ultimate decision would ultimately be dependent upon, I would say, they can address human health effects, for instance, by adding in labeling requirements to address potential specific human health effects. In other words, they do a cost-benefit analysis, but they also look at the actual use of the product and the labeling requirements. So, the short answer is that simply finding that a better description could have been used with respect to cancer would not lead to any particular deregistration or registration cancellation. And just on that point, I do want to touch on a couple other things about potential remedies here. I think, first, it was important to note that the interim registration decision was not required by Congress. The agency was hoping to get some of these issues completed before the October deadline, and that's what they did here. As a result of that, given that they completed the interim registration decision early, putting any sort of deadline on our requested remand of the ecological risk portion seems unnecessary. Quite frankly, we're within the statutory deadline, and we would submit that there's really no jurisdiction for the court to order us to do anything before that deadline occurs. Do you agree that you need to do an effect-proposed final and have notice and comment before you can issue a final? Yes. And to that point, I think it's worth touching briefly on the ESA claim. So, here, the agency is committed to doing an Endangered Species Act consultation prior to issuing its final decision. It's started that process. That process most likely will be somewhat lengthy, and they will complete it before making a final registration decision. And here, I will just note, I think Judge Friedland's question was well put. To be blunt, it's unlikely that any such registration would be completed prior to this October deadline. And so, if rural coalition is somehow right, and that an ESA consultation was needed before any interim decision, as a practical matter, that means no interim decision would be done by the agency in this case because they simply could not have completed it. And especially as we look at the agency taking further action on ecological risk on remand, if they were required to do an ESA decision before taking that action, they would effectively be barred or unable to do any subsequent interim decision on ecological risk. And I... ...to treat the interim decision as, like, both final and not final. So, you're asking us to leave it...you're asking us to remand so that you can fix it, which suggests that you think it matters in some way. But then you're also saying we don't really have to comply with the ESA until something else. And so, because it's not really final. Can you explain how those can be reconciled? Yes. I mean, so, our view is that, you know, essentially, I would put it as the interim decision initially basically finalized sort of everything except for the endangered species at consultation, which the agency committed to do before making a final decision. It looked at human health and ecological risk, which are the factors under the statute, under FFRA. We're asking for half of that, the ecological risk, to be remanded back to the agency for further consideration. The human health issue is ripe for review. If those are finalized and you chose what kind of labeling requirements they led to, then why haven't you taken an affirmative action that triggers ESA? I don't understand how that can be really your final action and not comply with the Endangered Species Act. Well, so, final agency action is not the trigger for ESA consultation. There must be a final agency action that, quote, may affect listed species or designated critical habitat. And here the petitioners haven't shown that the interim decision itself causes any effects. They're focused on the registration decisions, which obviously predate this interim decision and are before the court. But haven't you basically admitted that this kind of decision is going to, I mean, you're consulting because it is going, you've admitted that it's likely to affect all these thousand species. Well, I think we're admitting that the final decision will have an effect. But the final decision is, you've already finalized a lot of it. What's the final decision going to be other than the things you've already done? Well, Your Honor, I think it's worth pointing out that the, and again, this is discussed in the briefs, but the registration, these pesticides are registered. They are currently in use. And if the agency did not issue an interim decision, the pesticides would still be in use. In other words, the focus is what are the effects of the interim decision itself? And the interim decision itself does not allow for any greater use of glyphosate. It does not, it really doesn't change any of that. So the final decision will? Well, I think with the final decision, this court really doesn't need to address that question. And the reason I say it is twofold. One is obviously the final decision is not before this court. And two, the agency is committed to doing an ESA consultation before making a final decision. Right, but that's the part I just don't understand. I mean, it seems like you're sort of saying we already did the bulk of this. But when we actually call it final, we're going to have to comply with ESA. It seems like that means you should have complied with ESA before you did the bulk of it. I mean, you have already decided what labeling requirements are needed, right? Well, we've partially decided what labeling requirements are needed. I mean, that obviously can change through the course of ESA consultation. So I would note it's not a, ESA consultation could result in additional labeling requirements of the pesticides after consultation with the agency. You know, and while in general consultation doesn't require any specific results, it asks the agency to take into account the effects on listed species. And so certainly the agency would do that. We certainly don't want to imply that it's simply a pro forma consultation with the agency. What's the status of implementation of the labeling requirements from the interim decision? Well, in short, it's current, they've not been put in force yet. There is, I believe, an administrative petition that is being dealt with by the agency that relates to the labeling requirements. It's not clear exactly when these labeling requirements would go into effect. But as I understand it, your reason for asking us not to vacate the interim decision is about implementing those labeling requirements? Well, certainly that would be an effect of vacating the decision. I think we would ask the court not to vacate the decision because it's supported by substantial evidence in the administrative record. But you've admitted you need a remand on the ecological side, but you say don't vacate in the meantime. I thought that was because of these labeling requirements that you want to implement in the meantime. Correct. I think if we're just focusing on the ecological risk portion, then yes. And you said there's an administrative petition. Is that from people who don't want even those requirements or is it from people who want more requirements or is it just sand in the gears? I apologize. I don't know the particulars regarding that administrative petition other than I know it needs to be resolved before the agency would be able to essentially pull the registration and require the labeling requirements to be changed. Do the labeling requirements that were in the interim decision follow from the human health assessment or the ecological assessment or both? I believe from the ecological assessment. For instance, spray drift is one of the issues that's discussed, but I believe it's the ecological portion. We've been talking to your adversaries about how long we should put as a tag to be sure the EPA gets the answer out as quickly as possible. I think that's a fair argument given the background that we find this case. My problem is setting a time that doesn't interfere with the EPA but gets them to give us the decision as soon as possible. I don't know anything about it because I've never been on the EPA. I don't know what they're going to do. I've never had a relative there. So I guess we ask lawyers what sort of time is fair to get the job done and get it back to us. So I think in terms of the agency completing its ecological risk assessment, which is the portion of the decision that it's seeking remand of, we would submit that there's no need to put a deadline on the agency. And I'm not prepared today to say how long they need to complete that decision other than to note that the agency is well aware of the statutory deadline of October 2022. And I know for a fact petitioners are well aware that if the agency is unable to meet that deadline, they will have a remedy in court for unreasonable delay. And I think it would be best addressed later on when the agency can explain if it doesn't meet the deadline, why it couldn't, and its plans for going forward, rather than in the context of seeking remand of part of this interim decision, which again was not required by the agency, but they did so on a voluntary basis. So one of petitioners' concerns seems to be that if we wait until the final decision and there's litigation then about the final decision, that EPA is going to say to the extent this is the same as the interim decision, you had to challenge it earlier. Is that EPA's position at this point? The short answer is no. I think here, especially as we talk about the interim decision, there was a decision made on the ecological risk portion. We're asking for that to be remanded. I think certainly a possibility is the agency would do a subsequent interim decision with a revised ecological risk assessment that would be subject to judicial review and could be challenged. Certainly we reject the notion that this court somehow needs to keep jurisdiction of the interim decision to ensure that a subsequent decision, either an interim form or final form related to the ecological risk could be challenged. The problem is that we sit in panels and so we wait for another case and another panel is decided and it becomes very inefficient. What we sometimes do is hold on to a case and remand it back for a certain period of time. EPA can then come and say, wait a minute, we need another 30 days. That's fine. But the issue is, as I understand it, that it doesn't do us any good at all to send it back without any time delay or any time limit that you can then tell us, no, we need more time. That's what we would usually do. I'm not sure it fits into this type of a situation, so maybe you might respond. I would point to some of the cases in our reply brief in support of our motion for remand and that there is no requirement that the court set a deadline for agency action on remand. Here, again, there's been no claim of any sort of unreasonable delay. The agency was given until October 1, 2022 to complete a final registration. I would submit that putting any sort of deadline on the voluntary remand that the agency is seeking would be inappropriate at this juncture without any showing of unreasonable delay, without any showing that they're not working in good faith to address the issues that were put forward in their declarations. Again, I would argue that while I can understand some of the court's concerns about efficiencies, we have not addressed the ecological risk argument. We didn't address them in our briefs. I don't necessarily think there would be any inefficiency of if and when those ecological risks are finalized. It goes to a different panel because, again, that would involve entirely new briefing on the ecological risk issue. But you're hoping that we leave the human health assessment intact, which would, I assume, mean the final decision is going to have the same human health assessment if you prevail. Do you think there's an opportunity to challenge it at that point in the final decision, or is this the only opportunity to challenge the human health? I think it depends a little bit. I mean, the agency finalized this because they reached a conclusion and it was appropriate for review now. I think it would depend on what was put before the agency. Later on, certainly, the agency is always willing to look at new studies and when that final decision is issued. But, again, the reason the agency issued this interim decision was because they reached a conclusion about the human health effects of glyphosate and wanted to finalize it for review and not wait until a final decision is issued. And I take it if we do anything, you do not want the whole thing vacated and start over again. Well, no. I think if the decision was vacated and, I guess, to some extent, this is an interim decision, which wasn't required. I think, to some extent, it depends a little bit on what the court is somehow, and to be clear, I don't think this is where you're going, but on the human health effects thing, we need to go do more studies on glyphosate. That's a decade-long process, potentially. So, I think it is important to just put a perspective on what else does the agency need to do before completing this process, whether or not on the ecological risk portion, obviously the ESA portion, or the human health portion. Can you explain? So, I think you said that the labeling requirements that are in the interim decision come from the ecological assessment, not from human health. So, if there's nothing that's happening because of the human health assessment, why did it need to issue it as an interim decision? What was the rush to get it out before the final decision? Other than what's stated in the decision document, the agency had reached its conclusions and thought it was final and appropriate for review and wanted to move forward. I cannot speak to that, but to be clear, they weren't required to, and I guess I think they thought it would be more efficient to issue an interim decision with those aspects that they thought worked. We've taken you over your time, and maybe we're out of questions. Does anyone have more questions for EPA? Okay, let's go to Mr. Bresson. Judge Friedland, may it please the court. I've got a lot to cover, and I'll try to be succinct. I will note first that the administrative petition that the court asked about having to do with oats is a petition to reduce the tolerance level of glyphosate on oats and to forbid the use of glyphosate as a desiccant to stop the growth of the oats in order to reap them. So that's what that's about, but that's just a detail. And do you know any more about the status of that, or is that just unknown? I know what the public knows, Your Honor, and that's it, which is apparently still in process. I'd like to address first the human health risk assessment, because I think the agency did an extraordinary job on this, over 10 years of analysis, and I don't want to brush by that too quickly. The arguments made by the Rural Coalition and by NRDC to the contrary are largely based on mischaracterizations of the record, and I don't say that lightly. And I'll start with Rural Coalition. So they argue that the finding that the agency made, among other places on pages 99, 164, 170, and 175 of the supplemental ER, that its conclusion from just the epidemiological studies of NHL is inconclusive, is somehow flatly inconsistent with its conclusion that glyphosate is unlikely to cause cancer. And that's just false. On page 175 of the SCR, EPA addresses that very issue and says, yes, the epidemiological studies are inconclusive on NHL, but there are, quote, unquote, remarkably consistent studies from animal reference approach using modified Bradford Hill criteria to come to its conclusion that as a whole, it's unlikely to be a carcinogen to humans, and that's included for NHL. Now, Your Honor, Judge Friedland, you mentioned animal studies and some critiques made by that by the SAP. They did make some criticisms, and EPA responded to those criticisms just because there weren't scientifically certain or reliable answers for both pairwise and trend. It just said when there are pairwise and trend, we gave it more weight than if it was one versus the other. There's nothing unreasonable about that. The cancer guidelines said that one should be enough, and the agency said it was complying with the cancer guidelines. So it's these inconsistencies that are troubling me. I don't really understand that. Your Honor, when you say enough, you're saying enough to be significant for a particular study, and I understand that. The agency wasn't disagreeing with that. It was just saying, look, we're taking weight of the evidence, and that means taking everything into account. By the way, including criticisms of the individual studies for bias and other things. They took all of those into account, and yes, if you have pairwise and trend, they gave it more credit than if you had one or the other. But then they say, well, the evidence is conflicting, which conflicting evidence I think is supposed to be in a different cancer descriptor, and instead they use this cancer descriptor. So I can't piece together how what they did is consistent with the guidelines. So here's what I think the agency explained, Your Honor. Again, you can look at page 175 and other places where the agency discussed this. It looked at the cancer studies, the animal studies. It looked at them as a whole. It looked at each individual one first, and it understood that there were biases and other problems with them. It then looked at the meta-analysis and explained why it didn't credit those as much. It concluded as a whole from looking at all of those that there was no relationship between cancer and exposure. Now, some of the SAP panel members agreed with EPA on that very conclusion. Some did not. All EPA has to come to a conclusion that is reasonable. It also looked at genotoxicity. You'll notice there is nothing discussed by my opponents on genotoxicity because they've got nothing to say. Those tests, the genotoxicity tests, indicated there is no relationship to cancer. It is the expert agency, and I will note, not me and not the court, that's vested with looking at all of this from a way to the evidence standpoint and coming to a conclusion, and I think they came to a reasonable one, Your Honor. What are genotoxicity studies? Can you explain what that is? In a very layman way, Your Honor, because that's all I am. Genotoxicity studies look at the effect at a cellular level on genes. In other words, does the chemical change the genes in the cell enough to modify it to create a cancerous growth? And so that's what they were looking at with genotoxicity. My next point, Your Honor, is limit dose. Somebody asked a question about the 1,000 milligrams per kilogram per day. EPA actually explains that, the whole concept of what a limit dose is, and it refers to the 2005 guidelines. Now, guidelines aren't in the record, but if you look at a PDF online, it's between pages 43 and 46, and what they explain there is that if you go beyond the limit dose, the sheer amount of chemical that you're putting into a body, regardless of whether that chemical itself is carcinogenic or not, can have secondary effects that cause cancer. I thought the idea was that the limit dose is supposed to be set based on toxicity, and I didn't see anywhere where EPA actually looked at whether that was true here. It seemed like they had chosen this limit dose somehow separately from this toxicity way that's supposed to be how you do it. So the agency, again, relied there on guidelines that are cited in the 2005 guidelines. One of them, I think it's SAR-OPTTS 870.4300, states that the highest dose should be determined based on findings to ensure that the dose is adequate to assess chronic toxicity. And it says the highest dose tested need not exceed 1,000 milligrams per kilogram per day. Right, need not, but it doesn't say should not or cannot. I mean, it says not in every case does it have to, but the first part you read, it's supposed to be based on toxicity. And can you point to anything that says that that's how EPA chose the 1,000? Well, one of the things we know, Your Honor, is that EPA stated clearly that it found no cancer effects in or above that level, the 1,000 level. So I think if you look at toxicity, you'd see that they're not finding either toxicity or cancer effects below the 1,000 milligram per kilogram per day. And by the way, for dermal, it's 5,000. The agency looked at that in the test that they did, which was the rabbit test, and found not even skin inflammation under 5,000. So to put these numbers into some kind of context, the highest dose that humans get from oral, which is the 1,000, is 0.23 milligrams per kilogram per day. And the agency modeled what people ate, gave the highest, most conservative estimates it could based on tolerance level, and decided that children between one and two would get 0.23 milligrams per kilogram per day. Now, we're talking a number that is so vastly below the 1,000, Your Honor, that the agency's ultimate decision can't be viewed as unreasonable. If you look at the dermal, again, people that do the handling of glyphosate, EPA, again, using maximum criteria, said it could be exposed to 7 milligrams per kilogram per day. But again, EPA's test said under 5,000. But where did that 7 come from? I couldn't figure out where that 7 came from. Where did they get that number? So the 7 came from a modeling, Your Honor, again, using maximum amounts of glyphosate that someone could be exposed to as a handler. And what EPA, and they described that as, I can get you the, well, you probably know the site. You probably looked at it. If you need it, I can find it for you. But anyhow, that's a number that, of course, in the comments, nobody has disagreed with in one shape or form. Well, I don't know about that, because Rural Coalition is saying we have no idea what dermal absorption is. I'm saying in the comments, Your Honor, not in the brief. In the comments, they don't disagree with that number at all. They did make a comment about bathing in it, by the way. But, you know, that's just silly, right? I mean, EPA under the statute is looking at how you use the substance at issue consistent with limitations on the label and how it's commonly and widespreadly used. Limitations on the label, for example, do require that you wear long sleeves. Do require that you wash it off if you get it on yourself and use it as a pesticide, not as a bath salt, and certainly not as a beverage. So I'd like to address next, Your Honor, a failure to respond to comments, because this is now we go to NRDC. NRDC claims in this court in its argument that what it said in its comments was there are certain studies that EPA needs to look at to come to a reasoned conclusion with regard to human health effects. But I implore the court to actually look at the comments themselves, because that's not what NRDC said in the comments. The comments are at RCER 47 to 49. And what they actually said in those comments were that they pointed to the ATSDR draft, where ATSDR pointed out certain data gaps. And what NRDC argued there was that these data gaps require the use of a 10x FQPA safety factor, not a 1x FQPA safety factor. Now, EPA explained why it chose the 1x. It explained that at RCER 517 and 526. And you don't see NRDC before this court quibbling with that. Instead, they pivoted and changed their argument and said before this court, oh, no, no, no. We said that they have to do these studies. We said these studies are necessary. That wasn't their argument. So it's not properly here. Secondly, they mischaracterized the ATSDR. Your Honor, ATSDR was doing its own analysis for CERCLA purposes. It's a draft. It was doing it for CERCLA purposes and looking at whether the database was sufficient for coming to conclusions under CERCLA. And it explained very clearly that when it found a gap, in other words, when its table showed that there was no study for X or Y, it wasn't saying that the study was necessary. That's at RCER 314. Data gap is not a data need. And when it discussed what data needs meant, it said not all data needs must be filled. A data need is just something that would somewhat reduce uncertainty. So what ATSDR was talking about is, sure, you can always get another study. That's not the question before this court. The question before this court is, did NRDC in its comments explain why any of these particular studies, A, required a 10X factor, but B, why they'd be necessary for EPA to come to a reasonable conclusion? They didn't do any of that. They just pointed to quotable data gaps. And I submit EPA had no need to respond to somebody just saying, you didn't do this study. That's not a comment, Your Honor, that requires any kind of response. Of course, they didn't do every study, but that doesn't make their analysis unreasonable. Next, and I know I'm moving rather quickly here. You are way beyond your time. If you could have another minute and wrap up, that would be great. All right. So, Your Honor, a couple of things. First of all, there is no time limit this court can set for a new interim. That would violate Monsanto versus Geertsen, the Supreme Court case, because the agency is completely up to its discretion whether to come out with a new interim decision or just wait for the final. This court can't put in a requirement that the statute didn't. Next, redressability, Your Honor, you were on the right track. There's three things that are possible. One, they say, well, redressability is because you can cancel the registrations altogether. We all know that that's not something that would happen if you vacated this decision. Number two, they're unhappy that EPA didn't do its consultation earlier. Vacating doesn't take us back in time to allow them to do something earlier. Three, the only thing that really happened here is mitigation measures were initiated. They haven't started yet, but were initiated. And no one is claiming that they even may affect listed species. So vacating those, at best, does nothing at all. And at worst, of course, you know, on the margins, can harm them. Yes? Can I ask you one question about that? So EPA seems to be planning to implement – they've asked us not to vacate the interim decision so that they can implement these labeling requirements. But you're here on behalf of the industry. Would the industry rather that we do vacate if we were going to vacate so that you don't have two labeling requirements now and then a final one? I mean, is it a pain to change what the label is more than once or deal with a label change more than once? No, it really isn't, Your Honor. Folks in the field are used to that. And the label changes here are mostly label changes with regard to a spray drift is probably the major issue there. And it's just a matter of changing the label. The applicators read the label and, you know, they abide by it. So we don't have a position that this court should vacate it. In fact, there's no reason for this court to do so. If there are no other questions, then thank you for your forbearance. I appreciate it. Thank you. And let's go to the rebuttal argument. Thank you, Your Honors. I'd like to make three quick points. First, we're talking here in the health claims about EPA's own internal inconsistency. I've heard today my colleagues say that they've made a conclusion, but if you look at their decision at SDR 171, they say a conclusion regarding the association between glyphosate exposure and risk of NHL cannot be determined based on the available data. That is simply impossible to square with their later conclusion that glyphosate is overall not likely to cause cancer. EPA claimed it looked at the weight of evidence, but it merely paid lip service to the FAP's criticisms about the animal studies and it discounted numerous epidemiological studies and meta-analyses of the same, which were statistically significant and showed this risk. Second, EPA needs to grapple under the ESA with this bifurcated process it created and its duty to consult at the earliest time possible. That's at 50 CFR 402.14a. That is the ESA requirement. That EPA may be doing consultation on a later decision is not the same as doing an effects determination on the interim decision. Here, EPA simply made no effects determination at all as to the interim decision. This isn't a question of whether it may affect or not because EPA never made that decision. So that is not before the court. And that's a problem. Finally, the whole point of registration review is to ensure that this pesticide still meets the safety standards. This is the most widely used pesticide in the world. It is sprayed on over 300 or about 300 million acres in this country. That's the size of three Californias. And we are seeing tens if not hundreds of thousands of people getting sick with non-Hodgkin's lymphoma after being exposed to this pesticide. So EPA needs to take all of that information and it has to show that this pesticide is actually safe. So the court should vacate. And, of course, EPA can go back and set new mitigation measures after VOCADR. Thank you. Thank you, counsel. Let's hear from Mr. Rhodes. Thank you, Your Honor. Just three main points quickly. The first is the timing for remand. So EPA basically said it already issued its decision in advance of the statutory deadline. And essentially for that reason it should have as much time as it wants beyond the actual statutory deadline to address the issues raised by petitioners. But EPA made its final decision as to its FFRA determination. This is final agency action and it's before the court now. There's no reason to consider, well, you know, petitioners should count their blessings that we did this early. And also I want to note that EPA's counsel today said that it is not that EPA will not complete or is not likely to complete the ESA assessment by October 1st of 2022. And that's another reason why the deadline is necessary here that the many serious concerns raised by petitioners are addressed in advance of that final decision. And a deadline on remand is necessary because that is a court enforceable deadline to ensure that EPA actually does this required analysis. Moving briefly to Judge Friedland, I believe you asked, you know, EPA whether petitioners could challenge a future decision that kind of reaffirms aspects of a previous decision. And Judge Wallace is correct that, you know, so this is going to be a potentially a future, a different panel in the future. And although this court in National Family Farm Coalition rejected EPA's argument that those kinds of claims are time barred, they did so in an unpublished order. That would not be binding on a future panel to consider that issue. So the court should not allow EPA to renew this timeliness argument and really waste the court's time with that. And third, to address Aaron Miner's argument that we're mischaracterizing the record, the point of NRDC's comment was that these particular studies were missing. We highlighted one legal consequence of that, which was the FQPA factor. But the point is that these studies were missing from the record. And we've explained now that it's significant because one of the main conclusions of EPA in this decision is that it has enough information to conclude its analysis of the health effects of glyphosate. As to the ATSDR report, really that is irrelevant. The point of NRDC's claim here is that NRDC raised these data gaps. The fact that ATSDR initially raised it lends credence to that argument. But even absent the ATSDR report, NRDC's comments are significant and the agency needed to respond. So you agreed that we should remand. So the EPA said remand the ecological assessment. You said that's fine, but only if there's a deadline. If we disagreed that we could impose a deadline, would you still agree that we should remand? Or would you rather stay here and litigate and we order briefings? I think if the court were to... The court should not allow an indefinite amount of time for remand. If you're not going to set a deadline, it would be our preference to continue to litigate these claims now. And so we would have to order EPA to respond then? Because at this point we don't have briefing from them on your arguments. EPA and interveners had an opportunity to respond to petitioner's arguments and they elected not to do so. So petitioner's position would be that supplemental briefing is not necessary for the court to reach those issues. And if we said... We would set a deadline, but the deadline would be the statutory deadline of October 1. Would that be good enough for you? I mean, I know you'd like it sooner, but would you still be okay with the remand with that stated deadline? You're correct, Your Honor, that we would prefer an earlier deadline. But yes, to answer your question, if the court were to require EPA to complete its remand by October 1, that would be acceptable. Thank you. Thank you, counsel, all of you for the very helpful arguments in this very complicated and difficult case. We really appreciate your efforts and time. And stay well and stay healthy and thank you all. I think we're adjourned for the day.
judges: WALLACE, Boggs, FRIEDLAND